UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
FOUGERE HOLCOMBE,                                    MEMORANDUM
      Plaintiff,                AND ORDER
  - against -
US AIRWAYS GROUP, INC., et al.,                      08-CV-1593 (SLT) (JO)
      Defendants.
----------------------------------------------------------------X

James Orenstein, Magistrate Judge:

  Non-party attorney Vladimir Matsiborchuk ("Matsiborchuk") seeks to enforce a charging lien against his former client, plaintiff Fougere Holcombe ("Holcombe"); she, in turn, seeks to extinguish that lien on that ground that she discharged Matsiborchuk for cause. *See* Docket Entry ("DE") 114 (Matsiborchuk's original motion) ("MM I"); DE 196 (Matsiborchuk's renewed letter motion) ("MM II"); DE 185 (Holcombe's motion). Upon a referral from the Honorable Sandra L. Townes, United States District Judge, I now deny Matsiborchuk's motion for compensation, and grant Holcombe's motion to extinguish his charging lien.[1]

I. Background

  Holcombe, initially represented by Matsiborchuk, filed suit in 2008 against her former employer, US Airways, and her union, the International Association of Machinists and Aerospace Workers, for disability-based discrimination and retaliation in violation of federal, state, and municipal law. DE 1 (Complaint). Matsiborchuk continued to represent Holcombe for several years, although the timing and circumstances of the ending of that representation is in dispute. The record is clear, however, that in a letter dated December 24, 2013, written by her current counsel Raymond

---

[1] The court referred the motions to me for decision rather than for a report and recommendation. Order dated March 28, 2017. Such a referral is consistent with the Federal Magistrates Act, as it does not require me to decide any of the types of motions specified in 28 U.S.C. § 636(b)(1)(A). However, because the instant order is dispositive as to Matsiborchuk's lien against Holcombe, it is subject to *de novo* review should any timely objections be properly filed. *See* Fed. R. Civ. P. 72(b)(3).

Nardo ("Nardo"), Holcombe informed Matsiborchuk that she had discharged him for cause and asked him to execute a substitution of counsel form that she had already signed. *See* DE 187 (memorandum supporting Holcombe's motion) ("H Memo. I") at 2-3; MM I, Ex. 3.

In the letter discharging Matsiborchuk for cause, Holcombe cited several reasons for her decision. As Nardo described Holcombe's concerns:

> [Y]ou have filed documents in her case without her approval and consent, … you have suggested that she obtain a Law Guardian because she is incapable of making decisions due to some incapacity you diagnosed based on your alleged training in the Soviet Union, … you have accused Ms. Holcombe of colluding with courts against you, and you have asked her to pay for your wife's services as your legal assistant. [Holcombe] also had to pay a lien of $2,000 from a personal injury case to an attorney you referred for expenses allegedly incurred in this federal matter.

MM I, Ex. 3.

Over a month after Holcombe informed Matsiborchuk of his discharge for cause, on January 27, 2014, Matsiborchuk responded by claiming that he had already withdrawn from representation in October 2012. H Memo. I at 3; MM I, Ex. 4. He refused to execute the substitution form and notified Holcombe that he would pursue a demand for the reasonable value of his services rendered. *Id.* Holcombe filed a notice of consent to change counsel that same day, DE 110, and the court acknowledged the substitution by Order dated February 6, 2014.

On February 25, 2014, Matsiborchuk filed a motion seeking several forms of relief: disqualification of the magistrate judge then assigned to the case, a retaining lien in the amount of $4,398.58 for costs and expenses, and a charging lien of $184,128.70 for attorney's fees under the doctrine of *quantum meruit*. DE 114. The court referred the motion to the magistrate judge on March 13, 2014. DE 118. After engaging in settlement negotiations that failed to resolve the dispute, the magistrate judge determined that her recusal was not warranted for the reasons Matsiborchuk had advanced, but nevertheless determined *sua sponte* that her participation in settlement discussions required her recusal from the fact-finding that would be required to resolve the request for a

2

charging lien. *See* DE 134. The matter was then reassigned to me on September 26, 2014. DE 134. On September 30, 2014, the court denied Matsiborchuk's remaining requests for relief: the request for a retaining lien was denied outright,[2] and the request for a charging lien was denied as premature without prejudice to renewal upon a determination as to whether he was fired for cause following resolution of the underlying litigation. DE 136.

Holcombe later settled with the defendants, and the court approved the stipulation of dismissal on January 28, 2016. DE 174. On April 12, 2016, Holcombe asked for leave to seek relief as to her fee dispute with Matsiborchuk. DE 175. She filed her fully briefed motion to extinguish Matsiborchuk's charging lien on August 24, 2016. The submissions included the following materials:[3]

- Holcombe's notice of motion, DE 185;
- Nardo's supporting declaration, with exhibits, DE 186 ("Nardo Decl.");
- Holcombe's supporting memorandum, DE 187 ("H Memo. I");
- Matsiborchuk's affirmation in opposition, with exhibits, DE 188 ("Opp. I");
- Matsiborchuk's declaration with exhibits, DE 189 ("M Decl."); and
- Holcombe's reply memorandum and declaration, DE 190 ("Reply").

By Order dated November 22, 2016, I scheduled an evidentiary hearing for January 18, 2017, on the issue of whether Holcombe terminated Matsiborchuk for cause. On January 16, 2017, two

---

[2] Although the denial of the retaining lien required Matsiborchuk to turn over the case file to successor counsel immediately, Matsiborchuk did not do so. Instead, he filed a motion for reconsideration that the court denied on October 21, 2014. *See* DE 137; DE 138. Even after the denial of reconsideration, he ignored repeated requests from Nardo to produce the file. *See* DE 139. Instead, it took three more court orders, culminating in a warning that the next step would be an order to show cause why he should not be adjudged in contempt of this court's lawful authority, before Matsiborchuk finally allowed Nardo to retrieve his client's files on November 5, 2014. *See* Orders dated October 30, November 3, and November 4, 2014; DE 145; *see also* H Memo. I at 3.

[3] I cite the sealed, unredacted versions; the parties also filed redacted versions on the public docket.

3

days prior to the hearing, Matsiborchuk re-filed his original motion to withdraw from 2014, and stated that he was thereby renewing his charging lien and motion for compensation. DE 196.

The next day, on the eve of the hearing, Matsiborchuk filed a motion to disqualify Nardo on the basis of an alleged conflict of interest. DE 201. On January 18, 2017, I proceeded with the hearing as scheduled. At the start of the hearing, I heard argument on the motion to disqualify and concluded that the alleged conflict of interest was one that Holcombe could and did knowingly waive; I therefore denied the motion. Holcombe testified on direct examination, but Matsiborchuk required additional time to complete his cross-examination, and I scheduled the hearing to continue on February 3, 2017. *See* DE 202 (minute order); DE 212 (transcript of hearing dated Jan. 18, 2017) ("Tr. I").

On February 1, 2017, two days before the hearing was to resume, Matsiborchuk filed a motion to disqualify me, vacate my rulings at the hearing and subsequent orders, and reassign the case to a different judge. DE 204. At the outset of the continued hearing on February 3, 2017, I denied that motion. Matsiborchuk then proceeded with his cross-examination of Holcombe, but was unable to complete it in the allotted time. I therefore scheduled the conclusion of the hearing for February 24, 2017. *See* DE 205 (minute order); DE 213 (transcript of hearing dated Feb. 3, 2017) ("Tr. II").

Once again, two days before the hearing was to resume, on February 22, 2017, Matsiborchuk moved to disqualify me (and to call me as a witness), and also to transfer this action to another district court. DE 206. I denied the motion by Order dated February 23, 2017. Later the same day, Matsiborchuk filed a letter addressed to the court's Chief Judge asking her to transfer the matter to another district court. DE 207. The Chief Judge, having no authority over this case, properly took no action, but in an abundance of caution I consulted with her, and confirmed that she did not wish

4

to intervene, before proceeding with the conclusion of the hearing on February 24, 2017.[4] At the conclusion of Holcombe's testimony, both sides rested; notably, Matsiborchuk himself did not testify in his own behalf or to impeach Holcombe. At the close of the hearing, I invited each side to submit a post-hearing brief by March 27, 2017. *See* DE 208 (minute order); DE 214 (transcript of hearing dated Feb. 24, 2017) ("Tr. III"). Holcombe timely submitted her post-trial brief on March 27, 2017; Matsiborchuk belatedly submitted his on March 28, 2017. *See* DE 209 ("H Memo. II"); DE 211 ("Opp. II").[5]

II. Discussion

    A. Applicable Law

Under New York law, "'notwithstanding the terms of the agreement between them, a client has an absolute right, at any time, with or without cause, to terminate the attorney-client relationship by discharging the attorney.'" *Louima v. City of New York*, 2004 WL 2359943, at *59 (E.D.N.Y. Oct. 5, 2004) (quoting *Campagnola v. Mulholland, Minion & Roe*, 76 N.Y.2d 38, 43 (1990)), *aff'd sub nom*, *Roper-Simpson v. Scheck*, 163 F. App'x 70 (2d Cir. 2006). An attorney who is discharged without cause before a case ends "may recover either (1) in *quantum meruit*, the fair and reasonable value of the services rendered, or (2) a contingent portion of the former client's ultimate recovery, but only if both of the parties have so agreed." *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir. 2004). However, where the attorney's discharge "is for cause, the attorney has no right to compensation or a retaining lien, notwithstanding a specific retainer agreement."

---

[4] This was not the first time Matsiborchuk improperly sought relief from a judge not assigned to this case. On November 6, 2014, he similarly asked the current Chief Judge's predecessor to intervene. *See* DE 144. As in the later instance described above, the former Chief Judge properly ignored the request. Indeed, in both instances it is probable that the Chief Judge did not know of the filing when it was made because filings on the electronic docket are normally forwarded only to case participants.

[5] I consider Matsiborchuk's submission on the merits, despite its untimeliness.

*Garcia v. Teitler,* 2004 WL 1636982, at *5 (E.D.N.Y. July 22, 2004) (quoting *Campagnola*, 76 N.Y.2d at 44), *aff'd*, 443 F.3d 202 (2d Cir. 2006); *see also Adams v. City of New York*, 2014 WL 4649666, at *2 (E.D.N.Y. Sept. 16, 2014) ("[I]t is well-settled that an attorney loses his right to enforce a charging lien if the attorney … is discharged for cause." (internal citations and quotation marks omitted)); *Williams v. Hertz Corp.*, 427 N.Y.S.2d 825, 825-26 (App. Div. 1980) (holding that "an attorney who is discharged for cause or misconduct has no right to the payment of fees and no retaining lien on his client's papers"). In such a case, "[t]he burden rests with the client to demonstrate that there was just cause to terminate the attorney-client relationship." *Louima*, 2004 WL 2359943, at *60 (citing *Casper v. Lew Lieberbaum & Co.*, 1999 WL 335334, at *6 (S.D.N.Y. May 26, 1999)).

New York case law does not explicitly define "cause" for termination, but it does establish that the term "means that the attorney has engaged in some kind of misconduct, has been unreasonably lax in pursuing the client's case, or has otherwise improperly handled the case." *Garcia*, 2004 WL 1636982, at *5; *see Louima*, 2004 WL 2359943, at *60 (finding that when an attorney is "terminated for misconduct, the charging lien is forfeited"). Examples of the kind of attorney misconduct that support a finding of termination for cause include the following:

> (1) the attorney's failure to perform under the employment contract; (2) his lack of diligence in so performing; (3) his lack of ordinary skill or care in so performing; (4) his making of demands on the client which violate the terms or exceed the scope of the contract; (5) his taking of actions contrary to the client's interests or objectives; (6) his indulging in some sort of unprofessional conduct while handling the client's affairs; (7) his venting of personal or economic hostility toward the client; and (8) his loss of the client's trust and confidence.

*Garcia*, 2004 WL 1636982, at *6 (quoting 31 Am. Jur. Proof of Facts 2d 125 § 7 (Aug. 2003)). In particular, interference with the client's right to settle can constitute misconduct sufficient to warrant discharge for cause and forfeiture of counsel's fee. *Louima*, 2004 WL 2359943, at *60 (citing *Dagny Mgmt. Corp. v. Oppenheimer & Meltzer*, 606 N.Y.S.2d 337, 339 (App. Div. 1993)); *see also Marrero v.*

6

*Christiano*, 575 F. Supp. 837, 839 (S.D.N.Y. 1983) ("Under New York law, the refusal of a client to accept a settlement offer is not good and sufficient cause for the withdrawal of an attorney.").

B. Cause for Termination

1. Abusive Behavior

Holcombe asserted that Matsiborchuk treated her with disrespect and contempt during his representation. As she recounted, Matsiborchuk's misbehavior included name-calling, insults, and questioning her mental competence. *See* Nardo Decl., Ex. 1 (Holcombe Decl.) ¶¶ 2-9 (citing interactions with Matsiborchuk "refer[ing] to [her] as 'senseless,' 'stupid,' an 'idiot,' and 'crazy,' stating that [she] need[ed] to be institutionalized"); Tr. I 21-24 (testifying that Matsiborchuk often called her senseless, inept, and inadequate, and told her she was "psychologically impaired" and needed to be under guardianship); Tr. II 39 (Matsiborchuk's insults became "progressively more hostile and frightening as [their] relationship went on"); Tr. II 44 (Matsiborchuk called Holcombe names such as "'senseless,' 'stupid,' 'incompetent,' 'crazy,' … which made [her] very frightened and uncomfortable"); Tr. III 7-8 (Matsiborchuk was "[v]ery forceful, bullying, and belligerent" in communications "[r]epeatedly for years"); *see also* H Memo. II at 5-9.

Notwithstanding Matsiborchuk's denials, *see* Opp. II at 14-15, Holcombe's testimony in this regard was amply corroborated by the record of contemporaneous email exchanges between the two. Indeed, Matsiborchuk himself adduced evidence of such misconduct: to cite just one particularly egregious example, Matsiborchuk included as an exhibit to his own declaration an email in which he addressed his client thusly: "I firmly reject your pervert [sic] views and corrupt practice that you employed in this case. I reject all your bizarre and violent allegations contained in your latest communications." M Decl., Ex. 3 at 1 (Sept. 26, 2012 email). Other examples of gratuitously belittling communications abound. *See id.* at 4 (Oct. 21, 2009 email) ("You are intentionally taking my time to block my work on your case"); *id.* at 9 (May 13, 2009 email) ("Let's get things nice and

7

clear. … You are simply forcing me to remind you that the US Airways case is still before the court due solely to my effort, and you should have the common 'courtesy' to be thankful for that."); *id.* Ex. 5 at 1-2 (Oct. 10, 2012 email) ("In your communication, you made unintelligible and incoherent statements … [n]one of my clients have ever behaved like you."). Matsiborchuk's emails also reveal his repeated suggestions that Holcombe appoint a guardian, and his claimed ability to diagnose psychiatric competence. *See id.* Ex. 1 at 1 (Mar. 15, 2011 email) ("I told you during our last conference that I believe you require a guardian."); Oct. 10, 2012 email (providing the legal definition of "guardian", stating that he is "trained in the fields of forensic psychiatry, forensic psychology and forensic medicine [and] definitely trained to determine [the] existence [of psychiatric incompetence] and identify it[,]" and appending his graduate transcript as proof).[6]

Over a year before she discharged him for cause, Holcombe wrote to Matsiborchuk to protest his behavior and the toll she feared it would have on his ability to adequately represent her:

> Each time you behave in a belligerent, unprofessional manner, additional time is needed to diffuse the situation before there is any possibility of discussion. … You completely distort my own case evidence documentation and communication which is confidential information, privileged and confidential for the sole purpose of protecting me, not to harass, threaten, or humiliate me. To apply a false meaning to it and make it Public as somehow necessary to include with court filings raises serious ethical questions. In no way are you allowed to do that and are prohibited. You have threatened, coerced, and bullied me with withdrawal and suing me at every juncture, to ensure that you can do whatever you want through leveraging fear. You also make outrageous insults, claiming that there is something wrong with me; that I am incompetent or have cognitive impairment; and in need of a legal guardian. You are in no way qualified, nor is it appropriate for you to make such statements. As an attorney, I know it is not your area, but would hope you know the process for such a determination, and you are way out of bounds as my legal representative for making such statements. I have asked you to stop with these sort of devices, and insist on it again.

---

[6] Matsiborchuk maintains that he suggested that Holcombe obtain a law guardian if her health prevented her from participating in court proceedings, and that she merely misunderstood his purpose in producing his credentials, which was to demonstrate "his knowledge in this area of the law[.]" Opp. II at 13. Read in context, the record belies such *post hoc* rationalization; Matsiborchuk was plainly questioning Holcombe's mental health based on his own claimed ability to diagnose her.

8

M Decl., Ex. 5 at 3 (Oct. 9, 2012 email).

Holcombe echoed those concerns in other settings, both before and after she terminated Matsiborchuk for cause. *See* Holcombe Decl. ¶¶ 4-6 ("I was made to feel insecure and unstable by his badgering and ranting. I was actually fearful of him."); Oct. 10, 2012 email (Matsiborchuk observes that Holcombe is "dissatisfied with my services … and you do not trust me anymore."); Tr. I 47-48 (Holcombe was "in shock and scared to death and deeply upset and hurt and very afraid … I was frightened because … here is somebody that I had to trust and that I was relying on in a very vulnerable way and things were just awful then and … here was someone who was trying to take away my dignity"); Tr. II 39, 44 (Matsiborchuk's behavior "made [Holcombe] very frightened and uncomfortable and afraid" and insults became "progressively more hostile and frightening"); Tr. III 28-29 (Holcombe "had to be very careful because I was very, very afraid of [Matsiborchuk].").

Holcombe's testimony about Matsiborchuk's abusiveness was corroborated not only by the record of their prior communications, but also, to an extent, by Matsiborchuk's behavior during the hearing before me. Matsiborchuk was gratuitously combative and intimidating in his cross-examination of Holcombe, and repeatedly shouted and laughed contemptuously at her. *See* Tr. I 32 (instructing Matsiborchuk not to laugh at the witness); Tr. III 11 (instructing Matsiborchuk not to argue with the witness); Tr. III 45 (instructing Matsiborchuk not to laugh at the witness); Tr. III 46-47 (instructing Matsiborchuk not to engage in bad faith questioning, and warning the hearing would be concluded if he engaged in such misconduct again). Indeed, after multiple instructions not to engage in such conduct and warnings that further violations would result in the termination of his cross-examination, Matsiborchuk again laughed at Holcombe and thereby forfeited his right to continue questioning her (albeit long after the time originally allotted for such questioning had lapsed). *See* Tr. III 48-49.

9

In short, Matsiborchuk persistently treated Holcombe in a way that no client should have to endure. Such behavior qualifies as misconduct justifying termination for cause. *See Garcia*, 2004 WL 1636982, at *6 (citing factors such as "indulging in … unprofessional conduct while handling the client's affairs; … venting of personal or economic hostility toward the client; and … loss of the client's trust and confidence" as constituting just cause for termination).[7]

2. <u>Interference in the Client's Right to Settle</u>

An independent basis for Holcombe's decision to terminate Matsiborchuk for cause was his interference in her right to settle the case. *See Louima*, 2004 WL 2359943, at *60 (interference in client's right to settle can "constitute misconduct sufficient to warrant discharge for cause and forfeiture of [the attorney's] fee") (internal citations and alterations omitted). Specifically, in an email dated March 15, 2011, Matsiborchuk wrote to Holcombe as follows:

> "Your value assessment is unreasonable. … If you want to kill possible negotiations, I must protest. … There are rules and procedures in determining a fair and reasonable settlement, and as I have said a million times before, *I will determine whether a settlement is reasonable. If you disagree, I will immediately cease representing you and place a lien on your claim*. I spent four years on this case, the better part of which I had to deal with you as if you were an opposing party because of the way you chose to behave toward me.
>
> … You refused to even pay expenses and violated the retainer in other ways (for whatever reasons). Because of this, I suggest two options: (1) transfer your rights under the retainer to someone who will pay your expenses and uphold the retainer agreement, or (2) settle. … One of the consequences that results from your decision to not uphold the retainer agreement is the imposition of further losses on me and ultimately on you. These losses may stem from a refusal to agree to a reasonable

---

[7] Matsiborchuk faults Holcombe for failing to include allegations of such misconduct in her December 2013 notice of discharge. *See* Opp. II at 7, 14-15. Such argument misses the mark: Holcombe was under no obligation to provide him with a contemporaneous, detailed inventory of his lapses if she had good cause to terminate him. If Matsiborchuk's point is that the absence of detailed assertions in her termination letter impeaches her hearing testimony as recent fabrication, I respectfully disagree: as discussed above, the historical record demonstrates that Holcombe's concerns about Matsiborchuk's abusive behavior long preceded his termination for cause.

settlement. *You may choose to refuse to settle and refuse to uphold our retainer agreement, but the consequences for you would be dire.*"

Mar. 15, 2011 email (emphasis added); *see also* H Memo. II at 9-12. Matsiborchuk's demand to dictate the terms of settlement to his client stands in sharp contrast with the terms of the retainer agreement, which provides that Matsiborchuk "will not settle or compromise [Holcombe's] claims without [her] prior consent." M Decl., Ex. 3 at 12.[8]

Matsiborchuk's demands that Holcombe comply with his decisions regarding settlement are "actions contrary to the client's interests or objectives" and "demands on the client which violate the terms or exceed the scope of the contract[.]" *See Garcia*, 2004 WL 1636982, at *6. His improper threat to abandon the litigation, with "dire" consequences for Holcombe, if she did not accede to his demand to dictate her settlement position justified termination for cause not only because of its abusive nature, but independently because it interfered with Holcombe's right to settle. *Louima*, 2004 WL 2359943, at *60; *see also Marrero*, 575 F. Supp. at 839 ("[T]he refusal of a client to accept a settlement offer is not good and sufficient cause for the withdrawal of an attorney.").

---

[8] Although it is ultimately tangential to my ruling on the motions, I note that with respect to their dispute about the payment of expenses, Matsiborchuk is again in the wrong. The retainer agreement provided that Holcombe would be "responsible for the expenses in the course of this case[,]" *id.*, but it did not give Matsiborchuk the unlimited right either to incur expenses unilaterally or to require interim payment of such expenses. To the contrary, the agreement explicitly required Matsiborchuk to seek Holcombe's consent in advance of incurring expenses greater than $500, and had no provision allowing Matsiborchuk to insist on the immediate or advance payment of any expenses. *See id.* at 12-13. Indeed, the agreement explicitly left open the possibility that Holcombe's net recovery would be determined by the total recovery minus, among other things, "expenses paid by you *or advanced by me*[.]" *Id.* at 13 (emphasis added); *see also* Tr. I 25; Holcombe Decl. ¶ 2 (stating that Matsiborchuk's demands to pay him made no sense, since he was hired on contingency). Matsiborchuk's assertion that Holcombe's failure to pay expenses on demand was a breach of the retainer agreement is thus unfounded. I therefore need not and do not resolve the apparent factual dispute as to whether Holcombe paid such expenses. *See* Tr. I 39-40 (Holcombe's testimony that that she did in fact pay all expenses).

11

3. <u>Improper Threats to Withdraw</u>

Matsiborchuk's improper threat to abandon Holcombe unless she ceded control of settlement to him was not an isolated tactic: he repeatedly threatened to withdraw if she failed to listen to him and abide by his judgment. *See* Holcombe Decl. ¶ 5 ("If there were a dispute between us … he would repeatedly threaten to abandon representation of me."); *see also* H Memo. II at 12-14. In one email, Matsiborchuk "demands [Holcombe's] compliance with [his] directions" and states that "as long as I am representing you, you are not free in your decisions regarding the resolution of the legal issues pertaining to this matter." Oct. 21, 2009 email ("[I]f your behavior is aimed at my forceful withdrawal from your representation, my lien in your case is 33% of all proceeds … I explained to you many times that in order for us to be successful you must comply with my directions and stop your constant interference with my independent legal judgment. You have failed to abide by this requirement.").

In the September 26, 2012 email – the subject of which is "disengagement" – Matsiborchuk threatens Holcombe with withdrawal:

> You must comply with my legal decisions and you have no room for further discussion of that topic. If you don't accept the legal steps I consider as necessary and the legal work I have done, or, as you are saying, 'my bad attitude,' You must have changed [sic] your attorney."
>
> …
>
> I intend to seek withdrawal from your representation because you do not accept my legal position, refused to communicate with me and do not intend to compensate my work on your case.

Matsiborchuk repeated that improper threat in another email with the same subject heading sent several weeks later. *See* Oct. 10, 2012 email ("I have warned you in the past that I would have to withdraw if you were to continue to make unfounded criticisms of my work, to ignore my advice, to disagree with my position and to refuse to communicate with me. … Under these circumstances, I

12

can no longer continue to represent you in your legal matters.").[9] Matsiborchuk's multiple threats to abandon his representation of Holcombe if she did not comply with his dictates constitute misconduct warranting discharge for cause. *See Garcia*, 2004 WL 1636982, at *6 (citing "actions contrary to the client's interests or objectives" and "demands on the client which violate the terms or exceed the scope of the contract" as elements constituting just cause for termination).[10]

    4.        Other Misconduct

The foregoing suffices for me to conclude that Matsiborchuk gave Holcombe several independent reasons to discharge him for cause and therefore forfeited his right to collect a fee. In the interest of completeness, I note two other categories of misconduct that bolster resolution of the motions in Holcombe's favor but do not independently suffice to warrant such a result.

First, while representing Holcombe in this litigation, Matsiborchuk also gave Holcombe advice in a related bankruptcy case in which she was appearing *pro se* against US Airways Group, Inc. Holcombe testified that Matsiborchuk insisted she represent herself because he did not want another attorney sharing his fee. Holcombe Decl. ¶ 7; Tr. I 22; Tr. III 16-17. Holcombe lost that

---

[9] Despite the email's language purporting to withdraw, Matsiborchuk continued to be Holcombe's counsel of record until replaced by Nardo, and continued to hold himself out as such even longer. Indeed, when he initially applied for an award of fees after Holcombe had discharged him for cause, Matsiborchuk explicitly continued to hold himself out as Holcombe's current counsel who was only then seeking leave to withdraw. *See* MM I at 1.

[10] Matsiborchuk contends that Holcombe's "unprovoked hostility, insults, threats, accusations, lack of cooperation, unavailability, persistent questioning of attorney's work product and persistent intent to dictate and pursue her own legal theories and arguments directly contrary to the law her counsel's professional judgment … forced" him to withdraw from representation. MM I at 10; Opp. II at 11-12. I disagree that the record supports Matsiborchuk's characterization of his relationship with Holcombe, and note that he did not testify to such misbehavior (thereby exposing himself to cross-examination on the subject). More fundamentally, however, such argument is misplaced. The record is clear that Holcombe discharged Matsiborchuk long before he ever purported to seek leave to withdraw. The resolution of both motions thus turns not on whether Holcombe gave Matsiborchuk sufficient reason to withdraw – that question is wholly moot under the circumstances – but rather whether Matsiborchuk acted in such a way as to give Holcombe cause to fire him. As explained above, he did.

13

case on summary judgment because, at Matsiborchuk's behest, she failed to appear for a deposition. *See* H Memo. at 11; Holcombe Decl. ¶ 7; Tr. II 50-54; H Memo II at 14-15. During the evidentiary hearing before me, Holcombe testified that Matsiborchuk drafted a declaration for her to sign and send to the bankruptcy court indicating that she was too ill to attend her deposition, and that she would have attended had he not "forbade her to go." Tr. II 50-54. Holcombe's bankruptcy claims were ultimately dismissed, and she was precluded form asserting them in her federal action in this court. *See* DE 87 at 9-10. Matsiborchuk asserts that Holcombe's medical doctor expressed the professional opinion that she was not well enough to attend the deposition, and that he could not advise his client to appear "despite the clear express instructions of health professionals to the contrary." Opp. II at 16-17 (citing doctor's note). I found Holcombe's uncontroverted testimony on the matter to be credible, and sufficient to explain the existence of the doctor's note. Nevertheless, I would hesitate before resolving the instant motions in Holcombe's favor based solely on this episode, in part because the doctor's note lends some credence to Matsiborchuk's account, and in part because of the attenuation between Matsiborchuk's alleged conduct and its effect on Holcombe's litigation of this case.

Second, Matsiborchuk has engaged in disruptive tactics throughout the course of this litigation that would reasonably cause concern to any client. *See* H Memo. II at 15-18. A great deal of such disruptive behavior was on view after Holcombe's decision to discharge Matsiborchuk for cause: his refusal to sign a substitution of counsel and release the client file, even after repeated court orders to do so; his multiple, often last-minute, motions to disqualify lawyers and judges, to seek relief from those not authorized to give it, and to transfer the litigation elsewhere; his frequent untimely requests for delay; his claim at the evidentiary hearing – either feigned or unreasonable –

14

that he did not know its scope in advance and was therefore unable to prepare;[11] and his wholly unjustified accusations that other participants in this litigation harbored animus toward him because of his disability. *See* DE 144; DE 201; DE 204; DE 206; DE 207. No such conduct occurring after Matsiborchuk's discharge independently justifies resolving the pending motions in Holcombe's favor, but the consistency of his continued misbehavior lends credence to the proposition that Holcombe was genuinely, and reasonably, alarmed by Matsiborchuk's conduct at the time she discharged him.

III. Conclusion

For the reasons set forth above, I conclude that plaintiff Holcombe justifiably terminated her former counsel for cause; I therefore deny the attorney's motion for compensation in *quantum meruit* and grant the plaintiff's motion to extinguish the attorney's charging lien.

SO ORDERED.

Dated: Brooklyn, New York
March 29, 2017

/s/
JAMES ORENSTEIN
U.S. Magistrate Judge

---

[11] *Compare* Tr. II 5 (asserting lack of warning about the subject of the hearing), *with* Scheduling Order dated Nov. 22, 2016 (scheduling an evidentiary hearing "on the issue of termination for cause, as it relates to prior counsel, Vladimir Matsiborchuk").